UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

In re:                                          Case No. 08-13031-MFW

ECLIPSE AVIATION CORPORATION, *et*              Chapter 7
*al.*,[1]
                                                (Jointly Administered)
                Debtors.
_____/

JORGE MATA, AGUSTIN BUJAIDAR
SOLIS, GULFSTREAM NAUTICAL LLC,
OAKRIDGE AVIATION OF MONTANA,
LLC, MIKE ROMAN, IAN LLOYD, JEAN-
GEORGES SCHWARTZ, COASTJET
AIRCRAFT PTY LTD., AEOLUS
AVIATION HOLDINGS, LLC, A.R.
AIRWAYS, DIAMOND ISLAND JET
SERVICES LLC, NORTHWEST TRUSTEE
SERVICES, INC., JET-ALLIANCE
PARTNERS, LP, H&H COLOR LAB, INC.,
BRADLEY D. HOWARD, SKY JET, LLC,
TRITON ONE LLC, EDWARD ARTHUR            Adv. No. 08-51891-MFW
GOODMAN, 3CV AVIATION LLC,
INTERMODAL AVIATION INC., SONDHI
CONSULTING SERVICES LLC, PRIVATE
AIR, LLC, JOHN D. HARKEY JR.,
LANTECH LEASING LLC, and SHAUN
HUGHES, INHERITED ASSETS,

                Plaintiffs,

v.

JEOFFREY L. BURTCH, CHAPTER 7
TRUSTEE OF ECLIPSE AVIATION
CORPORATION, ECLIPSE AVIATION
CORPORATION, KINGS ROAD

---

[1] The debtors in these jointly administered cases are Eclipse Aviation Corp. and Eclipse IRB Support, LLC.

1

INVESTMENTS LTD., and JOHN DOE, 1
THROUGH 1,000,

       Defendants.

_____/

## SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF

Jorge Mata, Agustin Bujaidar Solis, Gulfstream Nautical LLC, Oakland Aviation of Montana, LLC, Mike Roman, Ian Lloyd, Jean-Georges Schwartz, CoastJet Aircraft Pty Ltd, Aeolus Aircraft Holdings, LLC, A.R. Airways, Diamond Island Jet Services LLC, Northwest Trustee Services, Inc., Jet-Alliance Partners, LP, H&H Color Lab, Inc., Bradley D. Howard, Sky Jet, LLC, Triton One LLC, Edward Arthur Goodman, 3CV Aviation LLC, Intermodal Aviation Inc., Sondhi Consulting Services LLC, Private Air, LLC, John D. Harkey Jr., Lantech Leasing LLC, and Shaun Hughes, Inherited Assets (the **"Plaintiffs"** or the **"Production Line Group"**), file this Complaint (the **"Complaint"**) for Declaratory and Other Relief against Jeoffrey L. Burtch, Chapter 7 Trustee for Eclipse Aviation Corporation (the **"Trustee"**), Eclipse Aviation Corporation (**"Eclipse"** or the **"Debtor"**), Kings Road Investments, Ltd., and certain noteholders designated as John Doe 1 through 1,000 (the **"Noteholders,"** and together with the Debtor, the **"Defendants"**) and allege:

## I.    PRELIMINARY STATEMENT

1.    This is an action seeking Declaratory Relief pursuant to 28 U.S.C. § 2201, and other forms of relief, for a determination that (i) the Plaintiffs possess certain property interests and rights in Eclipse 500 airplanes, including certain materials, components, parts, design materials design specifications and Federal Aviation Administration materials, bearing serial numbers: 261, 262, 263, 264, 265, 269, 270, 271, 272, 273, 274, 275, 276, 277, 279, 280, 281,

284, 286, 287, 288, 289. 290, 291, 292 and 293 (each an "**Airplane**" and collectively, the "**Airplanes**"), and (ii) that the Plaintiffs' property interests and rights in the Airplanes are superior to any interests and rights of the Defendants in the Airplanes. Additionally, the Plaintiffs are seeking replevin, specific performance, recovery of the Airplanes, the imposition of equitable liens and constructive trusts, and a determination that the Airplanes are not property of the Debtor's bankruptcy estate.

## II.  **JURISDICTION AND VENUE**

2.  This adversary proceeding is commenced pursuant to Rules 7001 *et seq.* of the Federal Rules of Bankruptcy Procedure.

3.  This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).

4.  Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

5.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## III.  **PARTIES**

6.  Jorge Mata is an individual residing in the country of Spain.

7.  Agustin Bujaidar Solis is an individual residing in the country of Mexico.

8.  Gulfstream Nautical LLC, is a Florida limited liability company with its principal business address located in Naples, Florida.

9.  Oakridge Aviation of Montana, LLC, is a Montana limited liability company with its principal business address located in Gig Harbor, Washington.

10.  Mike Roman, is an individual residing in Little Rock, Arkansas.

11.  Ian Lloyd, is an individual residing in the country of England.

12.  Jean-Georges Schwartz, is an individual residing in the country of France.

13.    CoastJet Aircraft Pty Ltd, is a limited liability company organized under the laws of the country of Australia.

14.    Aeolus Aviation Holdings, LLC, is a Florida limited liability company with its principal business address located in Miami, Florida.

15.    A.R. Airways, is a corporation organized under the laws of the country of India.

16.    Diamond Island Jet Services LLC, is a New Hampshire limited liability company with its principal business address located in Gilford, New Hampshire.

17.    Northwest Trustee Services, Inc., is a corporation organized under the laws of the state of Washington

18.    Jet-Alliance Partners, LP is a corporation organized under the laws of the state of California.

19.    H&H Color Lab, Inc., is a corporation organized under the laws of the state of Delaware.

20.    Bradley D. Howard, is an individual residing in California.

21.    Sky Jet, LLC, is a Delaware limited liability company with its principal business address located in Dover, Delaware.

22.    Triton One LLC, is a Texas limited liability company with its principal business address located in Dallas, Texas.

23.    Edward Arthur Goodman is an individual residing in Georgia.

24.    3CV Aviation LLC, is a Kentucky limited liability company with its principal business address located in Louisville, Kentucky.

25.    Intermodal Aviation Inc., is a corporation organized under the laws of the state of Florida.

26.     Sondhi Consulting Services, LLC, is an Indiana limited liability company with its principal business address located in Carmel, Indiana.

27.     Private Air, LLC, is a Delaware limited liability company with its principal business address located in Dover, Delaware.

28.     John D. Harkey Jr., is an individual residing in Texas.

29.     Lantech Leasing LLC, is a Kentucky limited liability company with its principal business address located in Louisville, Kentucky.

30.     Shaun Hughes, Inherited Assets, is an entity in which Shaun Hughes, an individual residing in the state of Washington, has an interest.

31.     The Trustee, Jeoffrey L. Burtch, is the Chapter 7 trustee for the bankruptcy estate of Eclipse Aviation Corporation and Eclipse IRB Support, LLC.

32.     Debtor, Eclipse Aviation Corporation, is a corporation organized under the laws of the state of Delaware with a principal place of business located in SE Albuquerque, New Mexico.

33.     Kings Road Investments, Ltd. and John Doe 1 through 1,000 are each Noteholders that have asserted a security interest in the Debtor's assets. King's Road Investments, Ltd. is an entity with a principal place of business located in New York, New York. John Doe 1 through 1,000 are each unknown Noteholders as to whom the Plaintiffs will seek names and addresses through discovery, if necessary.

## IV.     PROCEDURAL BACKGROUND

34.     On December 22, 2008, the Production Line Group filed its *Complaint for Declaratory and Other Relief* [D.E. #209] (the "**Complaint**"), initiating this Adversary Proceeding, No. 08-51891 (the "**Adversary Proceeding**"). On January 15, 2009, the Production

Line Group amended the Complaint and filed the *First Amended Complaint for Declaratory and Other Relief* [Adv. Proc. D.E. #4] (the "**First Amended Complaint**").

35.     On November 25, 2008 (the "**Petition Date**"), the Debtor filed a motion whereby the Debtor sought approval to sell substantially all the assets of the Debtor to a stalking horse bidder. After the bid deadline, the Debtor determined that there were no qualified competing bids, and no auction was held. The Court scheduled the sale hearing for January 16, 2009. After the filing of the First Amended Complaint, the Production Line Group was in settlement discussions with the Defendants and proposed buyer and therefore did not serve the First Amended Complaint on the Defendants.

36.     As the Court is aware, the Production Line Group entered into a settlement agreement prior to the entry of the sale order on January 17, 2009. The settlement agreement included a withdrawal of the First Amended Complaint conditioned upon the sale of the Debtor's assets to the Buyer.

37.     The buyer did not close on the sale of the assets, and on March 5, 2009, the Debtor's Chapter 11 case was converted to Chapter 7 and Jeoffrey L. Burtch was appointed Chapter 7 trustee (the "**Trustee**"). The Production Line Group has not yet served the First Amended Complaint on the Defendants.

38.     On June 12, 2009, the Court entered an Order granting the Production Line Group's *Motion Seeking Leave of Court to Amend Complaint and to Extend Time to Serve Amended Complaint* authorizing the Production Line Group to further amend its Complaint and extending time to serve its amended Complaint through July 20, 2009.

## V.     GENERAL ALLEGATIONS COMMON TO ALL COUNTS

## A.  THE DEBTOR

39.     The Debtor developed and manufactured twin turbofan jet aircrafts known as the Eclipse 500.

40.     On the Petition Date, the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**").  The Debtor continued to operate its business and manage its property as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

41.     On March 5, 2009, the Debtor's Chapter 11 case was converted to Chapter 7 and the Trustee was appointed.

## B.  JORGE MATA

42.     On July 19, 2007, Jorge Mata entered into an aircraft purchase agreement (the "**Mata APA**") with the Debtor for the purchase of an Eclipse 500 airplane, serial number 261 ("**Airplane 261**").

43.     The Mata APA was a form document drafted and created by the Debtor and governed by New Mexico law.  The Mata APA is substantially similar to the respective aircraft purchase agreements signed by one or more members of the Production Line Group.

44.     Pursuant to the terms of the Mata APA, the Debtor was required to manufacture and sell Airplane 261 to Jorge Mata, subject to certain standard aircraft specifications and including certain specific options, including equipment and amenities.

45.     Pursuant to Exhibit 2 of the Mata APA, the scheduled delivery date of Airplane 261 was January, 2008.

46.     Jorge Mata has remitted payments to the Debtor in the amount of $901,452.60, which constituted the 60% progress payment due under the Mata APA.

47.     The Debtor began manufacturing Airplane 261 to the specifications required under the Mata APA, and, upon information and belief, regularly communicated with Jorge Mata regarding the progress of Airplane 261.

48.     Jorge Mata received photographs of Airplane 261 from the Debtor, clearly identifiable and in production on the manufacturer's floor, displaying the serial number and the purchaser's name on the body of the aircraft.

49.     Attached hereto as **Composite Exhibit A** are true and correct copies of the Mata APA and one of the photographs sent to Jorge Mata by the Debtor.

### C.     AGUSTIN BUJAIDAR SOLIS

50.     On March 26, 2008, Agustin Bujaidar Solis entered into an aircraft purchase agreement (the "**Solis APA**") with the Debtor for the purchase of an Eclipse 500 airplane, serial number 262 ("**Airplane 262**").

51.     The Solis APA was a form document drafted and created by the Debtor and governed by New Mexico law.  The Solis APA is substantially similar to the respective aircraft purchase agreements signed by one or more members of the Production Line Group.

52.     Pursuant to the terms of the Solis APA, the Debtor was required to manufacture and sell Airplane 262 to Agustin Bujaidar Solis, subject to certain standard aircraft specifications and including certain specific options, including equipment and amenities.

53.     Pursuant to Exhibit 2 of the Solis APA, the scheduled delivery date of Airplane 262 was June, 2008.

54.     Agustin Bujaidar Solis has remitted payments to the Debtor in the amount of $850,621.40, which constituted the 60% progress payment due under the Solis APA.

55. The Debtor began manufacturing Airplane 262 to the specifications required under the Solis APA, and, upon information and belief, regularly communicated with Agustin Bujaidar Solis regarding the progress of Airplane 262.

56. Upon information and belief, Agustin Bujaidar Solis received photographs of Airplane 262, clearly identifiable and in production on the manufacturer's floor, displaying the serial number and the purchaser's name on the body of the aircraft.

57. Attached hereto as **Composite Exhibit B** are true and correct copies of the Solis APA and related documents.

**D. GULFSTREAM NAUTICAL LLC**

58. On April 21, 2007, Gulfstream Nautical LLC, entered into an aircraft purchase agreement (an "**Gulfstream APA**") with the Debtor for the purchase of an Eclipse 500 airplane, serial number 263 ("**Airplane 263**").

59. The Gulfstream APA was a form document drafted and created by the Debtor and governed by New Mexico law. The Gulfstream APA is substantially similar to the respective aircraft purchase agreements signed by one or more members of the Production Line Group.

60. Pursuant to the terms of the Gulfstream APA, the Debtor was required to manufacture and sell Airplane 263 to Gulfstream Nautical LLC, subject to certain standard aircraft specifications and including certain specific options, including equipment and amenities.

61. Pursuant to Exhibit 2 of the Gulfstream APA, the scheduled delivery date of Airplane 263 was November, 2007.

62. Gulfstream Nautical LLC has remitted payments to the Debtor in the amount of $1,078,111.80, which constituted the 60% progress payment due under the Gulfstream APA.

63. Between April 21, 2007 and November 25, 2008, the Debtor began manufacturing Airplane 263 to the specifications required under the Gulfstream APA, and, upon information and belief, regularly communicated with Gulfstream Nautical LLC regarding the progress of Airplane 263.

64. On some date after April 21, 2007, Gulfstream Nautical LLC, received photographs of Airplane 263 from the Debtor, clearly identifiable and in production on the manufacturer's floor, displaying the serial number and the purchaser's name on the body of the aircraft.

65. Attached hereto as **Composite Exhibit C** are true and correct copies of the Gulfstream APA and the photographs sent to Gulfstream Nautical LLC by the Debtor.

### E.    OAKRIDGE AVIATION OF MONTANA, LLC

66. On August 14, 2007, Gilbert Villarreal entered into an aircraft purchase agreement (the "**Oakridge APA**") with the Debtor for the purchase of an Eclipse 500 airplane, serial number 264 ("**Airplane 264**").

67. The Oakridge APA was a form document drafted and created by the Debtor and governed by New Mexico law. The Oakridge APA is substantially similar to the respective aircraft purchase agreements signed by one or more members of the Production Line Group.

68. On some date before November 25, 2008, Gilbert Villarreal assigned his rights and interests under the Oakridge APA, including all deposits and pre-delivery payments made in connection therewith, to Oakridge Aviation of Montana, LLC.

69. Pursuant to the assigned terms of the Oakridge APA, the Debtor was required to manufacture and sell Airplane 264 to Oakridge Aviation of Montana, LLC, subject to certain

standard aircraft specifications and including certain specific options, including equipment and amenities.

70. Pursuant to Exhibit 2 of the Oakridge APA, the scheduled delivery date of Airplane 264 was February, 2008.

71. Oakridge Aviation of Montana, LLC, remitted payments to the Debtor in the amount of $757,057.20, which payments together constituted the 60% progress payment due under the Oakridge APA.

72. Between August 14, 2007, and November 25, 2008, the Debtor began manufacturing Airplane 264 to the specifications required under the Oakridge APA, and, upon information and belief, regularly communicated regarding the progress of Airplane 264.

73. On some date after August 14, 2007, Oakridge Aviation of Montana, LLC, received photographs of Airplane 264 from the Debtor, clearly identifiable and in production on the manufacturer's floor, displaying the serial number and the purchaser's name on the body of the aircraft.

74. Attached hereto as **Composite Exhibit D** are true and correct copies of the Oakridge APA, related documents and the photographs sent to Oakridge Aviation of Montana LLC by the Debtor.

### F. MIKE ROMAN

75. On August 13, 2007, Mike Roman entered into an aircraft purchase agreement (the "**Roman APA**") with the Debtor for the purchase of an Eclipse 500 airplane, serial number 265 ("**Airplane 265**").

76.     The Roman APA was a form document drafted and created by the Debtor and governed by New Mexico law. The Roman APA is substantially similar to the respective aircraft purchase agreements signed by one or more members of the Production Line Group.

77.     Pursuant to the terms of the Roman APA, the Debtor was required to manufacture and sell Airplane 265 to Mike Roman, subject to certain standard aircraft specifications and including certain specific options, including equipment and amenities.

78.     Pursuant to Exhibit 2 of the Oakridge APA, the scheduled delivery date of Airplane 265 was February, 2008.

79.     Mike Roman has remitted payments to the Debtor in the amount of $864,423.00, which payments together constituted the 60% progress payment due under the Roman APA.

80.     Between August 13, 2007, and November 25, 2008, the Debtor began manufacturing Airplane 265 to the specifications required under the Roman APA, and, upon information and belief, regularly communicated regarding the progress of Airplane 265.

81.     On some date after August 13, 2007, Mike Roman received photographs of a Airplane 265, clearly identifiable and in production on the manufacturer's floor, displaying the serial number and the purchaser's name on the body of the aircraft.

82.     Attached hereto as **Composite Exhibit E** are true and correct copies of the Roman APA and one of the photographs.

### G.     IAN LLOYD

83.     On August 14, 2007, Spring Hill, LLC entered into an aircraft purchase agreement (the "**Lloyd APA**") with the Debtor for the purchase of an Eclipse 500 airplane, serial number 269 ("**Airplane 269**").

84.     The Lloyd APA was a form document drafted and created by the Debtor and governed by New Mexico law. The Lloyd APA is substantially similar to the respective aircraft purchase agreements signed by one or more members of the Production Line Group.

85.     On September 6, 2007, Spring Hill, LLC, assigned its rights and interests under the Lloyd APA, including all deposits and pre-delivery payments made in connection therewith, to Ian Lloyd.

86.     Pursuant to the assigned terms of the Lloyd APA, the Debtor was required to manufacture and sell Airplane 269 to Ian Lloyd, subject to certain standard aircraft specifications and including certain specific options, including equipment and amenities.

87.     Pursuant to Exhibit 2 of the Lloyd APA, the scheduled delivery date of Airplane 269 was February, 2008.

88.     Spring Hill Aviation LLC, remitted payments to the Debtor in the amount of $903,443.40, which constituted the 60% progress payment due under the Lloyd APA.

89.     Between August 14, 2007, and November 25, 2008, the Debtor began manufacturing Airplane 269 to the specifications required under the Lloyd APA, and, upon information and belief, regularly communicated regarding the progress of Airplane 269.

90.     Between August 14, 2007, and November 25, 2008, Ian Lloyd took photographs of Airplane 269, clearly identifiable and in production on the manufacturer's floor, displaying the serial number and the purchaser's name on the body of the aircraft.

91.     Attached hereto as **Composite Exhibit F** are true and correct copies of the Purchase Agreement Assignment, the invoice evidencing the amount of the deposit and one of the photographs.

## H.    JEAN-GEORGES SCHWARTZ

92.    On July 19, 2007, Jean-Georges Schwartz entered into an aircraft purchase agreement (the "**Schwartz APA**") with the Debtor for the purchase of an Eclipse 500 airplane, serial number 270 ("**Airplane 270**").

93.    The Schwartz APA was a form document drafted and created by the Debtor and governed by New Mexico law.  The Schwartz APA is substantially similar to the respective aircraft purchase agreements signed by one or more members of the Production Line Group.

94.    Pursuant to the terms of the Schwartz APA, the Debtor was required to manufacture and sell Airplane 270 to Jean-Georges Schwartz, subject to certain standard aircraft specifications and including certain specific options, including equipment and amenities.

95.    Pursuant to Exhibit 2 of the Schwartz APA, the scheduled delivery date of Airplane 270 was February, 2008.

96.    Stan Air LLC, remitted payment to the Debtor in the amount of $150,000.00[2] and Jean-Georges Schwartz remitted payment to the Debtor in the amount of $733,169.40, which payments together constituted the 60% progress payment due under the Schwartz APA.

97.    Between July 19, 2007, and November 25, 2008, the Debtor began manufacturing Airplane 270 to the specifications required under the Schwartz APA, and, upon information and belief, regularly communicated regarding the progress of the Airplane.

98.    On some date after July 19, 2007, Jean-Georges Schwartz received photographs of Airplane 270 from the Debtor, clearly identifiable and in production on the manufacturer's floor, displaying the serial number and the purchaser's name on the body of the aircraft.

---

[2] On June 27, 2007, Stan Air LLC, entered into a Deposit Agreement Assignment whereby, for the sum of $334,500.00 it assigned its rights and interests under its Eclipse 500 Deposit Agreement, including its $150,000.00 deposit, to Jean-Georges Schwartz.

99.     Attached hereto as **Composite Exhibit G** are true and correct copies of the invoice evidencing the amount of the deposit, the Deposit Agreement Assignment and one of the photographs sent by the Debtor to Jean-Georges Schwartz.

## I.     COASTJET AIRCRAFT PTY LTD

100.    On April 17, 2007, CoastJet Aircraft Pty Ltd, entered into two aircraft purchase agreements (collectively, the "**CoastJet APAs**") with the Debtor for the purchase of two Eclipse 500 airplanes, serial number 271 ("**Airplane 271**"), and serial number 276 ("**Airplane 276**").

101.    The CoastJet APAs were form documents drafted and created by the Debtor and governed by New Mexico law. The CoastJet APAs are substantially similar to the respective aircraft purchase agreements signed by one or more members of the Production Line Group.

102.    Pursuant to the terms of the CoastJet APAs, the Debtor was required to manufacture and sell Airplane 271 and Airplane 276 to CoastJet Aircraft Pty Ltd, subject to certain standard aircraft specifications and including certain specific options, including equipment and amenities.

103.    CoastJet Aircraft Pty Ltd, has remitted payments of $2,081,887.80 to the Debtor, which constituted the 60% progress payments due under the CoastJet APAs for each airplane.

104.    Between April 17, 2007 and November 25, 2008, the Debtor began manufacturing Airplane 271 and Airplane 276 to the specifications required under the CoastJet APAs, and, upon information and belief, regularly communicated regarding the progress of Airplane 271 and Airplane 276.

105.    Between April 17, 2007, and November 25, 2008, CoastJet Aircraft Pty Ltd, received photographs of Airplanes 271 and 276, clearly identifiable and in production on the

manufacturer's floor, displaying the serial number and the purchaser's name on the body of the aircraft.

106. Attached hereto as **Composite Exhibit H** are true and correct copies of the CoastJet APAs and related documents.

## J. AEOLUS AVIATION HOLDINGS, LLC

107. On September 19, 2007, Aeolus Aviation Holdings, LLC entered into an aircraft purchase agreement (the "**Aeolus APA**") with the Debtor for the purchase of an Eclipse 500 airplane, serial number 272 ("**Airplane 272**").

108. The Aeolus APA was a form document drafted and created by the Debtor and governed by New Mexico law. The Aeolus APA is substantially similar to the respective aircraft purchase agreements signed by one or more members of the Production Line Group.

109. Pursuant to the terms of the Aeolus APA, the Debtor was required to manufacture and sell the Airplane to Aeolus Aviation Holdings, LLC, subject to certain standard aircraft specifications and including certain specific options, including equipment and amenities.

110. Pursuant to Exhibit 2 of the Aeolus APA, the scheduled delivery date of Airplane 272 was February, 2008.

111. Aeolus Aviation Holdings, LLC has remitted payments to the Debtor in the amount of $830,000.00, which constituted the 60% progress payment due under the Aeolus APA.

112. Between September 19, 2007, and November 25, 2008, the Debtor began manufacturing Airplane 272 to the specifications required under the Aeolus APA, and, upon information and belief, regularly communicated regarding the progress of Airplane 272.

113. On some date after September 19, 2007, Aeolus Aviation Holdings, LLC, received photographs of a Airplane 272, clearly identifiable and in production on the manufacturer's floor, displaying the serial number and the purchaser's name on the body of the aircraft.

114. Attached hereto as **Composite Exhibit I** are true and correct copies of the Aeolus APA and one of the photographs.

### K.    A.R. AIRWAYS

115. During February, 2008, A.R. Airways, entered into an aircraft purchase agreement (the "**A.R. APA**") with the Debtor for the purchase of an Eclipse 500 airplane, serial number 273 ("**Airplane 273**").

116. The A.R. APA was a form document drafted and created by the Debtor and governed by New Mexico law. The A.R. APA is substantially similar to the respective aircraft purchase agreements signed by one or more members of the Production Line Group.

117. Pursuant to the terms of the A.R. APA, the Debtor was required to manufacture and sell Airplane 273 to A.R. Airways, subject to certain standard aircraft specifications and including certain specific options, including equipment and amenities.

118. Pursuant to Exhibit 2 of the A.R. APA, the scheduled delivery date of Airplane 273 was July, 2008.

119. World Aircraft Trading, Inc. remitted payment to the Debtor in the amount of $150,000.00,[3] and A.R. Airways, remitted payment to the Debtor in the amount of $757,057.20, which payments together constituted the 60% progress payment due under the A.R. APA.

---

[3] On January 25, 2008, World Aircraft Trading, Inc., entered into a Deposit Agreement Assignment whereby they assigned their rights and interests under their Eclipse 500 Deposit Agreement, including their $150,000.00 deposit, to A.R. Airways.

120. Between February, 2008, and November 25, 2008, the Debtor began manufacturing Airplane 273 to the specifications required under the Aeolus APA, and, upon information and belief, regularly communicated regarding the progress of Airplane 273.

121. Attached hereto as Composite **Exhibit J** are true and correct copies of the A.R. APA and the Deposit Agreement Assignment.

## L.      DIAMOND ISLAND JET SERVICES LLC

122. On February 12, 2007, Alan Mekler entered into an aircraft purchase agreement (the "**Diamond APA**") with the Debtor for the purchase of an Eclipse 500 airplane, serial number 274 ("**Airplane 274**").

123. The Diamond APA was a form document drafted and created by the Debtor and governed by New Mexico law. The Diamond APA is substantially similar to the respective aircraft purchase agreements signed by one or more members of the Production Line Group.

124. Upon information and belief, on July 3, 2008, Alan Mekler assigned his rights and interests under the Diamond APA, including all deposits and pre-delivery payments made in connection therewith, to Diamond Island Jet Services, LLC.

125. Pursuant to the assigned terms of the Diamond APA, the Debtor was required to manufacture and sell the Airplane to Diamond Island Jet Services, LLC, subject to certain standard aircraft specifications and including certain specific options, including equipment and amenities.

126. Pursuant to Exhibit 2 of the Diamond APA, the scheduled delivery date of Airplane 274 was August, 2007.

127. Alan Mekler remitted payments to the Debtor in the amount of $815,086.20, which constituted the 60% progress payment due under the Diamond APA.

128. Between February 12, 2007, and November 25, 2008, the Debtor began manufacturing Airplane 274 to the specifications required under the Diamond APA, and, upon information and belief, regularly communicated regarding the progress of the Airplane.

129. On some date after February 12, 2007, Diamond Island Jet Services, LLC, received photographs of Airplane 274, clearly identifiable and in production on the manufacturer's floor, displaying the serial number and the purchaser's name on the body of the aircraft.

130. Attached hereto as **Composite Exhibit K** are true and correct copies of the Diamond APA and one of the photographs.

## M.    NORTHWEST TRUSTEE SERVICES, INC.

131. On some date before November 25, 2008, Northwest Trustee Services, Inc., entered into an aircraft purchase agreement (the "**Northwest APA**") with the Debtor for the purchase of an Eclipse 500 airplane, serial number 275 ("**Airplane 275**").

132. The Northwest APA was a form document drafted and created by the Debtor and governed by New Mexico law. The Northwest APA is substantially similar to the respective aircraft purchase agreements signed by one or more members of the Production Line Group.

133. Pursuant to the terms of the Northwest APA, the Debtor was required to manufacture and sell Airplane 275 to Northwest Trustee Services, Inc., subject to certain standard aircraft specifications and including certain specific options, including equipment and amenities.

134. On some date before November 25, 2008, Northwest Trustee Services, Inc., remitted payments to the Debtor in the amount of $710,000.00, which constituted the 60% progress payment due under the Northwest APA.

135.    On some date before November 25, 2008, the Debtor began manufacturing Airplane 275 to the specifications required under the Northwest APA, and, upon information and belief, regularly communicated regarding the progress of Airplane 275.

136.    On some date before November 25, 2008, Northwest Trustee Services, Inc., received photographs of Airplane 275, clearly identifiable and in production on the manufacturer's floor, displaying the serial number and the purchaser's name on the body of the aircraft.

137.    Attached hereto as **Composite Exhibit L** are true and correct copies of the invoice evidencing the amount of the deposit and the photographs.

### N.    JET-ALLIANCE PARTNERS, LP

138.    On August 6, 2007, Jet-Alliance Partners, LP, entered into an aircraft purchase agreement (the "**Jet APA**") with the Debtor for the purchase of an Eclipse 500 airplane, serial number 277 ("**Airplane 277**").

139.    The Jet APA was a form document drafted and created by the Debtor and governed by New Mexico law.  The Jet APA is substantially similar to the respective aircraft purchase agreements signed by one or more members of the Production Line Group.

140.    Pursuant to the terms of the Jet APA, the Debtor was required to manufacture and sell the Airplane to Jet-Alliance Partners, LP, subject to certain standard aircraft specifications and including certain specific options, including equipment and amenities.

141.    Pursuant to Exhibit 2 of the Jet APA, the scheduled delivery date of Airplane 277 was February, 2008.

142.    J. William Firman, remitted payment to the Debtor in the amount of $75,000.00[4] and Jet-Alliance Partners, LP, remitted payment to the Debtor in the amount of $733,125.00, which payments together constituted the 60% progress payment due under the Jet APA.

143.    Between August 6, 2007, and November 25, 2008, the Debtor began manufacturing Airplane 277 to the specifications required under the Jet APA, and, upon information and belief, regularly communicated regarding the progress of Airplane 277.

144.    On some date after August 6, 2007, Jet-Alliance Partners, LP, received photographs of a Airplane 277, clearly identifiable and in production on the manufacturer's floor, displaying the serial number and the purchaser's name on the body of the aircraft.

145.    Attached hereto as **Composite Exhibit M** are true and correct copies of the Jet APA and the photographs.

## O.    H&H COLOR LAB, INC.

146.    On February 12, 2007, H&H Color Lab, Inc., entered into an aircraft purchase agreement (the "**H&H APA**") with the Debtor for the purchase of an Eclipse 500 airplane, serial number 279 ("**Airplane 279**").

147.    The H&H APA was a form document drafted and created by the Debtor and governed by New Mexico law. The H&H APA is substantially similar to the respective aircraft purchase agreements signed by one or more members of the Production Line Group.

148.    Pursuant to the terms of the H&H APA, the Debtor was required to manufacture and sell Airplane 279 to H&H Color Lab, Inc., subject to certain standard aircraft specifications and including certain specific options, including equipment and amenities.

---

[4] On June 23, 2005, J. William Firman, entered into a Deposit Agreement Assignment whereby, for the sum of $85,000.00 he assigned his rights and interests under their Eclipse 500 Deposit Agreement, including his $75,000.00 deposit, to Jet-Alliance Partners, LP.

149. H&H Color Lab, Inc. has remitted payments to the Debtor in the amount of $826,326.60, which constituted the 60% progress payment due under the H&H APA.

150. Between February 12, 2007, and November 25, 2008, the Debtor began manufacturing Airplane 279 to the specifications required under the H&H APA, and, upon information and belief, regularly communicated regarding the progress of the Airplane.

151. On some date after February 12, 2007, H&H Color Lab, Inc., received photographs of Airplane 279, clearly identifiable and in production on the manufacturer's floor, displaying the serial number and the purchaser's name on the body of the aircraft.

152. Attached hereto as **Composite Exhibit N** are true and correct copies of the H&H APA and the photographs.

### P.     BRADLEY D. HOWARD

153. On February 5, 2007, Brad Howard entered into an aircraft purchase agreement (the "**Howard APA**") with the Debtor for the purchase of an Eclipse 500 airplane, serial number 280 ("**Airplane 280**").

154. The Howard APA was a form document drafted and created by the Debtor and governed by New Mexico law. The Howard APA is substantially similar to the respective aircraft purchase agreements signed by one or more members of the Production Line Group.

155. Pursuant to the terms of the Howard APA, the Debtor was required to manufacture and sell the Airplane to Brad Howard, subject to certain standard aircraft specifications and including certain specific options, including equipment and amenities.

156. Pursuant to Exhibit 2 of the Howard APA, the scheduled delivery date of Airplane 272 was August, 2007.

157. Brad Howard has remitted payments to the Debtor in the amount of $822,255.64, which constituted the 60% progress payment due under the Howard APA.

158. Between February 5, 2007, and November 25, 2008, the Debtor began manufacturing Airplane 280 to the specifications required under the Howard APA, and, upon information and belief, regularly communicated regarding the progress of the Airplane.

159. On some date after February, 2007, Brad Howard received photographs of Airplane 280, clearly identifiable and in production on the manufacturer's floor, displaying the serial number and the purchaser's name on the body of the Airplane.

160. Attached hereto as **Composite Exhibit O** are true and correct copies of the Howard APA, the invoice evidencing the amount of the deposit, and the photographs.

### Q. SKY JET, LLC

161. On February 6, 2008, Sky Jet, LLC entered into an aircraft purchase agreement (the "**Sky Jet APA**") with the Debtor for the purchase of an Eclipse 500 airplane, serial number 281 ("**Airplane 281**").

162. The Sky Jet APA was a form document drafted and created by the Debtor and governed by New Mexico law. The Sky Jet APA is substantially similar to the respective aircraft purchase agreements signed by one or more members of the Production Line Group.

163. Pursuant to the terms of the Sky Jet APA, the Debtor was required to manufacture and sell the Airplane to Sky Jet, LLC, subject to certain standard aircraft specifications and including certain specific options, including equipment and amenities.

164. Pursuant to Exhibit 2 of the Sky Jet APA, the scheduled delivery date of Airplane 281 was July, 2008.

165. Sky Jet, LLC, has remitted payments to the Debtor in the amount of $859,201.80, which constituted the 60% progress payment due under the Sky Jet APA.

166. Between February 6, 2008, and November 25, 2008, the Debtor began manufacturing Airplane 281 to the specifications required under the Sky Jet APA, and, upon information and belief, regularly communicated regarding the progress of the Airplane.

167. Attached hereto as **Composite Exhibit P** is a true and correct copy of the invoice evidencing the amount of the deposit.

### R.    TRITON ONE, LLC

168. On August 13, 2007, Triton One, LLC, entered into an aircraft purchase agreement (the "**Triton APA**") with the Debtor for the purchase of an Eclipse 500 airplane, serial number 284 ("**Airplane 284**").

169. The Triton APA was a form document drafted and created by the Debtor and governed by New Mexico law. The Triton APA is substantially similar to the respective aircraft purchase agreements signed by one or more members of the Production Line Group.

170. Pursuant to the terms of the Triton APA, the Debtor was required to manufacture and sell the Airplane to Triton One, LLC, subject to certain standard aircraft specifications and including certain specific options, including equipment and amenities.

171. Pursuant to Exhibit 2 of the Triton APA, the scheduled delivery date of Airplane 284 was February, 2008.

172. Triton One, LLC, has remitted a payment to the Debtor in the amount of $874,205.40, which constituted the 60% progress payment due under the Triton APA.

173. Between August 13, 2007, and November 25, 2008, the Debtor began manufacturing the Airplane to the specifications required under the Triton APA, and, upon information and belief, regularly communicated regarding the progress of Airplane 284.

174. Attached hereto as **Composite Exhibit Q** is a true and correct copy of the invoice evidencing the amount of the deposit.

## S.    EDWARD A. GOODMAN

175. During February, 2007, Edward A. Goodman entered into an aircraft purchase agreement (the "**Goodman APA**") with the Debtor for the purchase of an Eclipse 500 airplane, serial number 286 ("**Airplane 286**").

176. The Goodman APA was a form document drafted and created by the Debtor and governed by New Mexico law. The Goodman APA is substantially similar to the respective aircraft purchase agreements signed by one or more members of the Production Line Group.

177. Pursuant to the terms of the Goodman APA, the Debtor was required to manufacture and sell the Airplane to Edward A. Goodman, subject to certain standard aircraft specifications and including certain specific options, including equipment and amenities.

178. Pursuant to Exhibit 2 of the Goodman APA, the scheduled delivery date of Airplane 286 was August, 2007.

179. Edward A. Goodman has remitted payments to the Debtor in the amount of $767,680.00, which constituted the 60% progress payment due under the Goodman APA.

180. On some date before November 25, 2008, the Debtor began manufacturing Airplane 286 to the specifications required under the Goodman APA, and, upon information and belief, regularly communicated regarding the progress of Airplane 286.

181.     On November 7, 2008, Edward A. Goodman received photographs of Airplane 286 from the Debtor, clearly identifiable and in production on the manufacturer's floor.

182.     Attached hereto as **Composite Exhibit R** is a true and correct copy of the invoice evidencing the amount of the deposit and the photographs.

## T.     3CV AVIATION, LLC

183.     On February 12, 2007, Bramco Inc. entered into an aircraft purchase agreement (the "**3CV APA**") with the Debtor for the purchase of an Eclipse 500 airplane, serial number 287 ("**Airplane 287**").

184.     The 3CV APA was a form document drafted and created by the Debtor and governed by New Mexico law. The 3CV APA is substantially similar to the respective aircraft purchase agreements signed by one or more members of the Production Line Group.

185.     On October 18, 2007, Bramco Inc. assigned its rights and interests under the 3CV APA, including all deposits and pre-delivery payments made in connection therewith, to 3CV Aviation, LLC.

186.     Pursuant to the assigned terms of the 3CV APA, the Debtor was required to manufacture and sell Airplane 287 to 3CV Aviation, LLC, subject to certain standard aircraft specifications and including certain specific options, including equipment and amenities.

187.     Pursuant to Exhibit 2 of the 3CV APA, the scheduled delivery date of Airplane 287 was August, 2007.

188.     Bramco Inc., remitted payments to the Debtor in the amount of $815,386.20, which constituted the 60% progress payment due under the 3CV APA.

189.    Between February 12, 2007, and November 25, 2008, the Debtor began manufacturing Airplane 287 to the specifications required under the 3CV APA, and, upon information and belief, regularly communicated regarding the progress of Airplane 287.

190.    During October, 2008, the Debtor's customer care department informed a representative of 3CV Aviation, LLC, that Airplane 287 was on the production line.

191.    Attached hereto as **Composite Exhibit S** are true and correct copies of the 3CV APA, the Purchase Agreement Assignment and the invoice evidencing the amount of the deposit.

### U.    INTERMODAL AVIATION, INC.

192.    On February 12, 2007, Intermodal Aviation, Inc., entered into an aircraft purchase agreement (the "**Intermodal APA**") with the Debtor for the purchase of an Eclipse 500 airplane, serial number 288 ("**Airplane 288**").

193.    The Intermodal APA was a form document drafted and created by the Debtor and governed by New Mexico law.  The Intermodal APA is substantially similar to the respective aircraft purchase agreements signed by one or more members of the Production Line Group.

194.    Pursuant to the terms of the Intermodal APA, the Debtor was required to manufacture and sell the Airplane to Intermodal Aviation, Inc., subject to certain standard aircraft specifications and including certain specific options, including equipment and amenities.

195.    Pursuant to Exhibit 2 of the Intermodal APA, the scheduled delivery date of Airplane 288 was August, 2007.

196.    Walker Family Press Limited Family Partnership, LLC, remitted payment to the Debtor in the amount of $75,000.00,[5] and Intermodal Aviation, Inc. remitted payments to the

---

[5] On September 7, 2006, Walker Family Press Limited Family Partnership, LLC, entered into a Deposit Agreement Assignment whereby they assigned their rights and interests under their Eclipse 500 Deposit Agreement, including their $75,000.00 deposit, to Intermodal Aviation, Inc.

Debtor in the amount of $782,454.00, which payments together constituted the 60% progress payment due under the Intermodal APA.

197. Between February 12, 2007, and November 25, 2008, the Debtor began manufacturing Airplane 288 to the specifications required under the Intermodal APA, and, upon information and belief, regularly communicated regarding the progress of Airplane 288.

198. Attached hereto as **Composite Exhibit T** are true and correct copies of the Intermodal APA, and the invoice evidencing the amount of the deposit.

## V. SONDHI CONSULTING SERVICES, LLC

199. On February 8, 2007, Sondhi Consulting Services, LLC, entered into an aircraft purchase agreement (the "**Sondhi APA**") with the Debtor for the purchase of an Eclipse 500 airplane, serial number 289 ("**Airplane 289**").

200. The Sondhi APA was a form document drafted and created by the Debtor and governed by New Mexico law. The Sondhi APA is substantially similar to the respective aircraft purchase agreements signed by one or more members of the Production Line Group.

201. Pursuant to the terms of the Sondhi APA, the Debtor was required to manufacture and sell Airplane 289 to Sondhi Consulting Services, LLC, subject to certain standard aircraft specifications and including certain specific options, including equipment and amenities.

202. Pursuant to Exhibit 2 of the Sondhi APA, the scheduled delivery date of Airplane 289 was August, 2007.

203. Anoop Sondhi, remitted payment to the Debtor in the amount of $150,000.00,[6] and Sondhi Consulting Services, LLC, remitted payment to the Debtor via wire transfer in the

---

[6] On February 6, 2007, Anoop Sondhi entered into a Deposit Agreement Assignment whereby he assigned his rights and interests under his Eclipse 500 Deposit Agreement , including his $150,000.00 deposit, to Sondhi Consulting Services, LLC.

amount of $657,110.64, which payments together constituted the 60% progress payment due under the Sondhi APA.

204.    Between February 8, 2007, and November 25, 2008, the Debtor began manufacturing Airplane 289 to the specifications required under the Sondhi APA, and, upon information and belief, regularly communicated regarding the progress of Airplane 289.

205.    Attached hereto as **Composite Exhibit U** is a true and correct copy of the Sondhi APA, and the Deposit Agreement Assignment.

## W.    PRIVATE AIR, LLC

206.    On January 17, 2008, Private Air, LLC entered into an aircraft purchase agreement (the **"Private Air APA"**) with the Debtor for the purchase of an Eclipse 500 airplane, serial number 290 (**"Airplane 290"**).

207.    The Private Air APA was a form document drafted and created by the Debtor and governed by New Mexico law. The Private Air APA is substantially similar to the respective aircraft purchase agreements signed by one or more members of the Production Line Group.

208.    Pursuant to the terms of the Private Air APA, the Debtor was required to manufacture and sell Airplane 290 to Private Air, LLC, subject to certain standard aircraft specifications and including certain specific options, including equipment and amenities.

209.    Pursuant to Exhibit 2 of the Private Air APA, the scheduled delivery date of Airplane 290 was July, 2008.

210.    Private Air, LLC, has remitted payments to the Debtor in the amount of $859,201.80, which constituted the 60% progress payment due under the Private Air APA.

211.     Between January 17, 2008, and November 25, 2008, the Debtor began manufacturing Airplane 290 to the specifications required under the Private Air APA, and, upon information and belief, regularly communicated regarding the progress of Airplane 290.

212.     Attached hereto as **Composite Exhibit V** are true and correct copies of the Private Air APA and the invoice evidencing the amount of the deposit.

## X.     JOHN D. HARKEY, JR.

213.     On July 19, 2007, John Harkey, Jr. entered into an aircraft purchase agreement (the "**Harkey APA**") with the Debtor for the purchase of an Eclipse 500 airplane, serial number 291 ("**Airplane 291**").

214.     The Harkey APA was a form document drafted and created by the Debtor and governed by New Mexico law.  The Harkey APA is substantially similar to the respective aircraft purchase agreements signed by one or more members of the Production Line Group.

215.     Pursuant to the terms of the Harkey APA, the Debtor was required to manufacture and sell Airplane 291 to John Harkey, Jr., subject to certain standard aircraft specifications and including certain specific options, including equipment and amenities.

216.     Pursuant to Exhibit 2 of the Harkey APA, the scheduled delivery date of Airplane 291 was February, 2008.

217.     John Harkey, Jr. has remitted payments to the Debtor in the amount of $870,575.40, which constituted the 60% progress payment due under the Harkey APA.

218.     Between July 19, 2007, and November 25, 2008, the Debtor began manufacturing the Airplane 291 to the specifications required under the Harkey APA, and, upon information and belief, regularly communicated regarding the progress of Airplane 291.

219. Attached hereto as **Composite Exhibit W** are true and correct copies of the Harkey APA, photographs of Airplane 291 in production and the invoice evidencing the amount of the deposit.

## Y. LANTECH LEASING LLC

220. On July 16, 2007, Lantech Leasing LLC, entered into an aircraft purchase agreement (the "**Lantech APA**") with the Debtor for the purchase of an Eclipse 500 airplane, serial number 292 ("**Airplane 292**").

221. The Lantech APA was a form document drafted and created by the Debtor and governed by New Mexico law. The Lantech APA is substantially similar to the respective aircraft purchase agreements signed by one or more members of the Production Line Group.

222. Pursuant to the terms of the Lantech APA, the Debtor was required to manufacture and sell Airplane 292 to Lantech Leasing LLC, subject to certain standard aircraft specifications and including certain specific options, including equipment and amenities.

223. Pursuant to Exhibit 2 of the Lantech APA, the scheduled delivery date of Airplane 292 was February, 2008.

224. Lantech Leasing LLC, has remitted payments to the Debtor in the amount of $879,279.00, which constituted the 60% progress payment due under the Lantech APA.

225. Between July 16, 2007, and November 25, 2008, the Debtor began manufacturing Airplane 292 to the specifications required under the Lantech APA, and, upon information and belief, regularly communicated regarding the progress of the Airplane.

226. Attached hereto as **Composite Exhibit X** is a true and correct copy of the Lantech APA.

## Z.    SHAUN HUGHES, INHERITED ASSETS

227.    On August 16, 2007, Shaun Hughes, Inherited Assets, entered into an aircraft purchase agreement (the "**Hughes APA**") with the Debtor for the purchase of an Eclipse 500 airplane, serial number 293 ("**Airplane 293**").

228.    Pursuant to the terms of the Hughes APA, the Debtor was required to manufacture and sell Airplane 293 to Shaun Hughes, Inherited Assets, subject to certain standard aircraft specifications and including certain specific options, including equipment and amenities.

229.    On August 16, 2007, Shaun Hughes, Inherited Assets, attempted to assign his rights and interests under the Hughes APA, including all deposits and pre-delivery payments made in connection therewith, to Pigeon Creek Equipment, LLC. The Debtor orally agreed to such assignment, but never provided written consent.

230.    Shaun Hughes, Inherited Assets, has remitted payments to the Debtor in the amount of $854,196.00, which constituted the 60% progress payment due under the Hughes APA.

231.    Between August 16, 2007 and November 25, 2008, the Debtor began manufacturing Airplane 293 to the specifications required under the Hughes APA.

232.    Attached hereto as **Composite Exhibit Y** are true and correct copies of the Hughes APA and the invoice evidencing the amount of the deposit.

## AA.    ADDITIONAL COMMON ALLEGATIONS

233.    Before the Petition Date, the Debtor and one or members of the Production Line Group entered into an aircraft purchase agreement, by and through which the Debtor manufactured and sold one or more of the Airplanes to one or more members of the Production Line Group.

234. Before the Petition Date, one or more of the members of the Production Line Group, as required by the their respective aircraft purchase agreements, remitted deposits and installment payments in the aggregate totaling over approximately $22,000,000.00, and representing approximately 60% of the final purchase prices of their respective Airplanes.

235. On or before the Petition Date, one or more of the Airplanes were shipped, marked, or otherwise designated as the Airplane to which the applicable aircraft purchase agreement refers. Alternatively, one or more of the Airplanes existed and were identified at the time the applicable aircraft purchase agreements were made.

236. The Debtor has failed to timely deliver one or more of the Airplanes.

237. Upon information and belief, the Debtor will repudiate one or more of the aircraft purchase agreements.

## COUNT I

### DECLARATION THAT THE MEMBERS OF THE PRODUCTION LINE GROUP HOLD SPECIAL PROPERTY RIGHTS AND INTERESTS IN THE AIRPLANES
### (against all Defendants)
### (28 U.S.C. § 2201 and N.M. Stat. § 55-2-501)

238. The Production Line Group reassert and incorporate by reference herein the allegations contained in Paragraphs 1 through 237 above.

239. As of the Petition Date, one or more members of the Production Line Group each had special property rights and interests in the respective Airplanes pursuant to New Mexico Statute § 55-2-501.

240. Upon information and belief, some or all Defendants may dispute the special property rights and interests of one or more members of the Production Line Group in the Airplanes.

241. There is a real and immediate controversy as to the property rights and interests in the Airplanes under New Mexico Statute § 55-2-501.

WHEREFORE, Plaintiffs request entry of a judgment in each of their favor against the Defendants (1) declaring that each of the Plaintiffs possess fully valid and enforceable special property rights and interests in their respective Airplanes under New Mexico Statute § 55-2-501 and (2) granting such other relief as the Court deems appropriate.

## COUNT II

**THE PRODUCTION LINE GROUP ARE
ENTITLED TO REPLEVY THE AIRPLANES
(against all Defendants)
(N.M. Stat. §§ 55-2-711(2)(b) & 55-2-716(3))**

242. The Production Line Group reassert and incorporate by reference herein the allegations contained in Paragraphs 1 through 241 above.

243. One or more members of the Production Line group may replevy their Airplanes because one or more of the Airplanes were identified to their respective aircraft purchase agreements and because one or more members of the Production Line Group are unable to effect cover for the Airplanes, or the circumstances indicate that such effort will be unavailing.

244. One or more of the Airplanes have been marked and designated by the Debtor for one or more members of the Production Line Group.

245. One or more members of the Production Line Group are unable to effect cover for their respective Airplanes because the Debtor is the sole manufacturer of the Eclipse Model EA 500 and the Airplanes are unique, specially manufactured and in limited supply.

246. One or more members of the Production Line Group purchased their respective Airplanes for personal, family or household use.

WHEREFORE, Plaintiffs request entry of a judgment in each of their favor against the Defendants (1) granting each of the Plaintiffs the right to replevy their respective Airplanes, free and clear of all rights and interests of the Defendants and (2) granting such other relief as the Court deems appropriate.

## COUNT III

**THE PRODUCTION LINE GROUP ARE**
**ENTITLED TO SPECIFIC PERFORMANCE**
**(against all Defendants)**
**(N.M. Stat. §§ 55-2-711(2)(b) & 55-2-716(1))**

247.    The Production Line Group reassert and incorporate by reference herein the allegations contained in Paragraphs 1 through 246 above.

248.    The Airplanes are unique, specially manufactured very light jets.

249.    Other proper circumstances warrant specific performance, which will be established at trial.

WHEREFORE, Plaintiffs request entry of a judgment in their favor against the Defendants (1) granting each of the Plaintiffs' right to specific performance of their respective aircraft purchase agreements, free and clear of all rights and interests of the Defendants and (2) granting such other relief as the Court deems appropriate.

## COUNT IV

## THE PRODUCTION LINE GROUP ARE ENTITLED
## TO RECOVERY OF THE AIRPLANES
**(against all Defendants)**
**(N.M. Stat. § 55-2-502)**

250.    The Production Line Group reassert and incorporate by reference herein the allegations contained in Paragraphs 1 through 249 above.

251.    Before the Petition Date, one or more members of the Production Line Group had paid part or all of the purchase price of their respective Airplanes.

252.    On or before the Petition Date, one or more of the Airplanes were shipped, marked, or otherwise designated as the Airplane to which the applicable aircraft purchase agreement refers. Alternatively, one or more of the Airplanes existed and were identified at the time their respective aircraft purchase agreements were made.

253.    One or more members of the Production Line Group purchased their respective Airplanes for personal, family or household use. Alternatively, the Debtor became insolvent within ten days of receiving the first payment installment from one or more members of the Production Line Group.

WHEREFORE, Plaintiffs request entry of a judgment in their favor against the Defendants (1) granting Plaintiffs' rights to recover their respective Airplanes pursuant to New Mexico Statute §55-2-502, free and clear of all rights and interests of the Defendants and (2) granting such other relief as the Court deems appropriate.

## COUNT V

### THE PRODUCTION LINE GROUP POSSESS AN
### EQUITABLE LIEN OVER THE AIRPLANES
#### (against all Defendants)
#### (Common Law)

254.    The Production Line Group reassert and incorporate by reference herein the allegations contained in Paragraphs 1 through 253 above.

255.    Where equities dictate, New Mexico law recognizes the existence of an equitable lien as a judicially-created security interest in property.

256.    One or more members of the Production Line Group have a right to have specific property, or its proceeds, applied towards the payment of a particular debt — the respective amounts remitted to the Debtor for the Airplanes.

257.    Equities dictate that one or more members of the Production Line Group be granted an equitable lien in the respective Airplanes to ensure that they are not stripped of their substantial interests in their respective Airplanes.

WHEREFORE, the Plaintiffs request entry of a judgment in their favor and against the Defendants (1) granting each of the Plaintiffs an equitable lien in the respective Airplanes and (2) granting such other relief as the Court deems appropriate.

## COUNT VI

### DECLARATION THAT THE PRODUCTION LINE
### GROUP'S PROPERTY INTERESTS IN THE AIRPLANES
### ARE SUPERIOR TO THE NOTEHOLDERS
#### (against the Noteholders)
#### (N.M. Stat. § 55-9-320(a))

258.    The Production Line Group reassert and incorporate by reference herein the allegations contained in Paragraphs 1 through 257 above.

259. One or more members of the Production Line Group have special property rights and interests in their respective Airplanes and are entitled to possession, replevin and/or specific performance and/or recovery of their respective Airplanes.

260. One or more members of the Production Line Group purchased their Airplanes from the Debtor, a seller in the business of selling aircrafts who is not a pawnbroker.

261. One or more of the Airplanes were purchased in good faith without knowledge that the sale violates the rights of any other person.

262. The Noteholders' security interests were created by the seller of the Airplanes, the Debtor.

263. One or more members of the Production Line Group may take the Airplanes free of any security interests created by the seller of the Airplanes.

264. There is a real and immediate controversy as to the priority of interests in the Airplanes.

WHEREFORE, the Plaintiffs request entry of a judgment in their favor against the Noteholders (1) declaring that each of the Plaintiffs were buyers in the ordinary course; (2) declaring each of the Plaintiffs' interest in their respective Airplanes superior to all other interests of the Noteholders and (3) granting such other relief as the Court deems appropriate.

## COUNT VII

### THE PRODUCTION LINE GROUP ARE ENTITLED TO HAVE THE AIRPLANES PLACED IN A CONSTRUCTIVE TRUST
**(against all Defendants)**
**(Common Law)**

265. The Production Line Group reassert and incorporate by reference herein the allegations contained in Paragraphs 1 through 264 above.

266. Under New Mexico law, the imposition of a constructive trust over property is an appropriate remedy where the debtor: (1) holds bare legal title to property and (2) would be unjustly enriched if the debtor were permitted to retain such property.

267. One or more members of the Production Line Group are purchasers of their respective Airplanes under their respective aircraft purchase agreements.

268. One or more members of the Production Line Group are equitable owners of their respective Airplanes.

269. At best, the Debtor holds bare legal title to the Airplanes.

270. The Debtor is currently in possession of deposits and payment installments remitted by one or members of the Production Line Group, totaling in the aggregate approximately more than $22,000,000.00.

271. If the Debtor were permitted to retain the Airplanes and the funds remitted, the Debtor would be unjustly enriched.

WHEREFORE, the Plaintiffs request entry of a judgment in their favor against the Defendants (1) granting the imposition of a constructive trust over each of their respective Airplanes and (2) granting such other relief as the Court deems appropriate.

## COUNT VIII

### DECLARATION THAT ONE OR MORE AIRPLANES ARE
### NOT PROPERTY OF THE ESTATE
**(against all Defendants)**
**(Bill of Sale)**
**(28 U.S.C. § 2201 & 11 U.S.C. § 541)**

272. The Production Line Group reasserts and incorporates by reference herein the allegations contained in Paragraphs 1 through 271 above.

273. Upon information and belief, one or more of the members of the Production Line Group received a bill of sale for their respective Airplanes before the Petition Date.

274. Any of the Airplanes for which the respective member of the Production Line Group received a bill of sale is not property of the estate.

275. Upon information and belief, one or more of the Defendants may dispute that one or more of the Airplanes are not property of the estate.

276. There is a real and immediate controversy whether one or more of the Airplanes are property of the estate.

WHEREFORE, Plaintiffs request entry of a judgment in each of their favor against the Defendants (1) declaring that each of the Airplanes are not property of the estate and (2) granting such other relief as the Court deems appropriate.

## COUNT IX

### DECLARATION THAT ONE OR MORE AIRPLANES ARE NOT PROPERTY OF THE ESTATE
(against all Defendants)
(Special Property Interest)
(28 U.S.C. § 2201 & 11 U.S.C. § 541)

277. The Production Line Group reasserts and incorporates by reference herein the allegations contained in Paragraphs 1 through 276 above.

278. One or more members of the Production Line Group holds a special property interest in their respective Airplanes.

279. Any of the Airplanes in which the respective member of the Production Line Group holds a special property interest are not property of the estate.

280. Upon information and belief, one or more of the Defendants may dispute that one or more of the Airplanes are not property of the estate.

281. There is a real and immediate controversy whether one or more of the Airplanes are property of the estate.

WHEREFORE, Plaintiffs request entry of a judgment in each of their favor against the Defendants (1) declaring that each of the Airplanes are not property of the estate and (2) granting such other relief as the Court deems appropriate.

### COUNT X

**DECLARATION THAT ONE OR MORE AIRPLANES ARE
NOT PROPERTY OF THE ESTATE
(against all Defendants)
(Constructive Trust)
(28 U.S.C. § 2201 & 11 U.S.C. § 541)**

282.    The Production Line Group reassert and incorporate by reference herein the allegations contained in Paragraphs 1 through 281 above.

283.    One or more of the Airplanes are held in constructive trust for the benefit of the respective members of the Production Line Group.

284.    Any Airplanes held in constructive trust for the benefit of the respective members of the Production Line Group are not property of the estate.

285.    Upon information and belief, the Debtor disputes that one or more of the Airplanes are held in constructive trust.

286.    Upon information and belief, the Debtor disputes that one or more of the Airplanes that are held in constructive trust are not property of the estate.

287.    There is a real and immediate controversy as to whether the Airplanes held in constructive trust are property of the estate.

WHEREFORE, the Plaintiffs request entry of a judgment in their favor against the Defendants (1) declaring that the Airplanes held in constructive trust are not property of the estate and (2) granting such other relief as the Court deems appropriate.

## COUNT XI

### DECLARATION THAT ONE OR MORE AIRPLANES MAY NOT BE SOLD UNDER 11 U.S.C. § 363(B)
(against all Defendants)
(28 U.S.C. § 2201 & 11 U.S.C. §§ 363 & 541)

288. The Production Line Group reasserts and incorporates by reference herein the allegations contained in Paragraphs 1 through 287 above.

289. One or more of the Airplanes are not property of the estate.

290. The Debtor may not sell Airplanes that are not property of the estate under 11 U.S.C. § 363(b).

291. Upon information and belief, one or more of the Defendants may dispute that one or more of the Airplanes are not property of the estate.

292. Upon information and belief, one or more of the Defendants may dispute that the Debtor may not sell Airplanes that are not property of the estate under 11 U.S.C. § 363(b).

293. There is a real and immediate controversy whether one or more of the Airplanes may be sold under 11 U.S.C. § 363(b).

WHEREFORE, Plaintiffs request entry of a judgment in each of their favor against the Defendants (1) declaring that none of the Airplanes may be sold under 11 U.S.C. § 363(b) and (2) granting such other relief as the Court deems appropriate.

## COUNT XII

### DECLARATION THAT ONE OR MORE AIRPLANES MAY NOT BE SOLD FREE AND CLEAR OF INTERESTS UNDER 11 U.S.C. § 363(F)
(against all Defendants)
(Equitable Rights not Interests)
(28 U.S.C. § 2201 & 11 U.S.C. § 363(f))

294. The Production Line Group reasserts and incorporates by reference herein the allegations contained in Paragraphs 1 through 293 above.

295. One or more members of the Production Line Group holds a special property interest in, a constructive trust on, or an equitable lien on (collectively, the **"Equitable Rights"**) their respective Airplanes.

296. An "interest," as that term is used in 11 U.S.C. § 363(f), does not include the Equitable Rights that one or more members of the Production Line Group hold in their respective Airplanes.

297. The Debtor may not sell the Airplanes "free and clear" under 11 U.S.C. § 363(f) of any of the Equitable Rights in the Airplanes.

298. Upon information and belief, one or more of the Defendants may dispute that an "interest," as that term is used in 11 U.S.C. § 363(f), does not include the Equitable Rights.

299. Upon information and belief, one or more of the Defendants may dispute that the Debtor may not sell the Airplanes "free and clear" under 11 U.S.C. § 363(f) of the Equitable Rights.

300. There is a real and immediate controversy whether the Equitable Rights are "interests" under 11 U.S.C. § 363(f) and whether any of the Airplanes may be sold "free and clear" of the Equitable Rights under 11 U.S.C. § 363(f).

WHEREFORE, Plaintiffs request entry of a judgment in each of their favor against the Defendants (1) declaring that the Equitable Rights are not "interests" as that term is defined in 11 U.S.C. § 363(f); (2) declaring that none of the Airplanes may be sold free and clear of the Equitable Rights under 11 U.S.C. § 363(f); and (3) granting such other relief as the Court deems appropriate.

## COUNT XIII

**DECLARATION THAT ONE OR MORE AIRPLANES MAY
NOT BE SOLD FREE AND CLEAR OF INTERESTS
UNDER 11 U.S.C. § 363(F)
(against all Defendants)
(Predicates Not Met)
(28 U.S.C. § 2201 & 11 U.S.C. § 363(f))**

301.    The Production Line Group reasserts and incorporates by reference herein the allegations contained in Paragraphs 1 through 300 above.

302.    One or more members of the Production Line Group holds Equitable Rights in their respective Airplanes.

303.    Applicable nonbankruptcy law does not permit sale of the Airplanes subject to the Equitable Rights free and clear of the Equitable Rights.

304.    None of the members of the Production Line Group consent to a sale free and clear of the Equitable Rights.

305.    Certain of the Equitable Rights are not liens.

306.    To the extent that any of the Equitable Rights are liens, the aggregate value of all the liens on the Airplanes exceeds any proposed sale price.

307.    The Equitable Rights are subject to a legal dispute only, and are not "in bona fide dispute" as that term is used in 11 U.S.C. § 363(f)(4).

308.    The Debtor may not sell the Airplanes "free and clear" under 11 U.S.C. § 363(f) of any of the Equitable Rights in the Airplanes.

309.    Upon information and belief, one or more of the Defendants may dispute that the Debtor may not sell the Airplanes "free and clear" under 11 U.S.C. § 363(f) of the Equitable Rights.

310. There is a real and immediate controversy whether any of the Airplanes may be sold "free and clear" of the Equitable Rights under 11 U.S.C. § 363(f).

WHEREFORE, Plaintiffs request entry of a judgment in each of their favor against the Defendants (1) declaring that none of the Airplanes may be sold free and clear of the Equitable Rights under 11 U.S.C. § 363(f) and (2) granting such other relief as the Court deems appropriate.

Dated: July 16, 2009
Wilmington, Delaware

Respectfully submitted,

GREENBERG TRAURIG, LLP

*Victoria W. Counihan*

Victoria W. Counihan (No. 3488)
Dennis A. Meloro (No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360
Email: counihanv@gtlaw.com
      melorod@gtlaw.com

-and-

Paul J. Keenan Jr.
1221 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717
Email: keenanp@gtlaw.com

Counsel to the Production Line Group